IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

JARROD BALLESTER,

     PLAINTIFF                     14 Civ 4700 (LTS)(FM)
                                  FIRST AMENDED
     vs                        COMPLAINT [JURY TRIAL]

THE CITY OF NEW YORK, a
municipal entity, NEW YORK
CITY POLICE OFFICERS THOMAS
SLOCKBOWER, Shield # 14493,
individually and in his
official capacity, and "JOHN
DOES", individually
and in their official
capacities, NEW YORK CITY
POLICE OFFICER MATTHEW
RODRIGUEZ, Shield # 25611,
individually and in his official
capacity, FORMER NEW YORK
CITY POLICE OFFICER [NOW RETIRED]
ROBERT RICCARDI, individually and
in his former official capacity

     DEFENDANTS

_____

I.  INTRODUCTION

1.  This is a litigation which arises out of the
Plaintiff's unreasonable and unnecessary and legally
unjustified stop and detention and custodial arrest by
Defendants New York City Police Officers Thomas Slockbower,
Shield # 14493, Matthew Rodriguez, Shield # 25611, Robert
Riccardi (now retired), and "John Does" on Friday, May 3,
2013 at or about 2:15 to 2:30 P.M. commencing on the
southbound 5 train and continuing thereafter; and,
associated therewith, the unnecessary, unreasonable and
excessive force inflicted upon the Plaintiff at the time of
his stop, detention, and custodial arrest.

2.   This is an action in which the Plaintiff seeks relief for the violation of his rights as guaranteed under the laws and Constitution of the United States.

3.   The Plaintiff seeks monetary damages and such other relief, including injunctive relief and declaratory relief (if appropriate), as may be in the interest of justice and as may be required to assure that the Plaintiff secures full and complete relief and justice for the violation of his rights.

## II. JURISDICTION

4.   Jurisdiction of this Court is invoked pursuant to and under 28 U.S.C. Sections 1331 and 1343 and 1367 in conjunction with the Civil Rights Act of 1871, 42 U.S.C. Section 1983, and the Fourth and Fourteenth Amendments to the United States Constitution and the laws and Constitution of the State of New York.

5.   The Plaintiff also invokes the jurisdiction of this Court in conjunction with the Declaratory Judgment Act, 28 U.S.C. Sections 2201, et seq., this being an action in which the Plaintiff seeks, in addition to monetary damages, whatever other relief is needed to provide full and complete justice including, if appropriate, declaratory and injunctive relief.

6. The venue for the prosecution of this litigation resides in this District Court given that the event which gives rise to the litigation occurred in the geographic boundaries of this District Court; and given that the Plaintiff resides within the geographic boundaries of this District Court; and the Defendants have locations for doing business within the geographic boundaries of this District Court.

7.   This is an action in which the Plaintiff seeks relief for the violation of his rights as guaranteed under the laws and Constitution of the United States.

## III. THE PARTIES

8.   The Plaintiff is a Hispanic American citizen of Puerto Rican national origin and resident of the City of New York, the County of New York, and the State of New York.

9.    The Defendant City of New York is a municipal entity which was created under the authority of the laws and Constitution of the State of New York and which, under the enabling law of the State of New York, has, among other powers, the power to maintain a police department for the purpose of enforcing the laws of the State and of the City of New York and providing for the safety of those individuals who live and/or traverse within the boundaries of the City of New York.

10.    Defendants Thomas Slockbower, Shield # 14493 and "John Does" and Matthew Rodriguez, Shield # 25611, Shield # 25611 are New York City Police Officers and agents and employees of the City of New York.  They are sued in their individual and in their official capacities. Defendant Robert Riccardi is a former New York City Police Officer (now retired). He is sued in his individual and former official capacities.

11.    Although the actions and conduct of the Defendant party Officers hereinafter described were unlawful and wrongful and otherwise violated the Plaintiff's rights as guaranteed under the laws and Constitution of the United States,  they were taken in and during the course of their duties and functions as New York City Police Officers and as agents and employees of the City of New York and incidental to the otherwise lawful performance of their duties and functions as New York City Police Officers and as agents and employees of the City of New York; and the actions were taken by the Defendant Officers pursuant to the otherwise unlawful policies and practices of the Defendant City of New York.

12.    The real party in interest in this litigation is the Defendant City of New York and the Defendant Officers are, in both their individual capacities as well as in their official capacities, one and the same.

IV. ALLEGATIONS

13.    This is a litigation which arises out of the Plaintiff's unreasonable and unnecessary and legally unjustified stop and detention and arrest by Defendant New York City Police Officers Thomas Slockbower, Shield # 14493, Matthew Rodriguez, Shield # 25611, Robert Riccardi (now retired), and "John Does" on Friday, May 3, 2013 at or

about 2:15 to 2:30 P.M. commencing on the southbound 5 subway train and continuing thereafter; and, associated therewith, the unnecessary, unreasonable and excessive force inflicted upon the Plaintiff at the time of his stop, detention, and custodial arrest.

14.   The Plaintiff is Jarrod Ballester.

15.   The Plaintiff is a resident of the City of New York, the County of New York, and the State of New York.

16.   The Plaintiff resides on Frederick Douglas Boulevard, New York City, New York 10039.

17.   On the date of the event which gives rise to this litigation, the Plaintiff was residing with his sister on Adee Avenue [and Bouck Avenue], the Bronx, New York.

18.   The Plaintiff is forty seven [47] years of age.

19.   The Plaintiff's birth date is January 25, 1967.

20.   The Plaintiff graduated from Hoboken High School in Hoboken, New Jersey.

21.   The Plaintiff graduated from Hoboken High School in 1986.

22.   At the time of the litigation event in question herein, the Plaintiff was employed at El Cemi Housing Development which is located on 250 East 117th Street at 2nd Avenue, New York City, New York 10035 and is part of and operated by the over-all entity known as the Institute for the Puerto Rican Hispanic Elderly which has its offices at 105 East 22nd Street-Suite # 615, New York City, New York.

23.   El Cemi Housing Development is a residence facility for elderly individuals with various physical and/or mental impairments. Its residents are largely of Hispanic national origin.

24.   At the time of the litigation event in question herein, Plaintiff worked at the foregoing El Cemi Housing Development on a part time basis.

25.   The Plaintiff's position at the time was that of front desk clerk.

26.  Depending on the week, the Plaintiff worked either three or four days (either Thursday through Sunday or Friday through Sunday).

26.  At the time, the Plaintiff's shift for the performance of his duties was the front desk clerk is 4:00 P.M. to 12:00 midnight.

27.  As of the date of the event which gives rise to the litigation, the Plaintiff had been employed in his position at the El Cemi Housing Development for approximately six months or thereabouts.

28.  Prior to his employment at El Cemi, the Plaintiff was unemployed including a period of time when he was receiving unemployment benefits.

29.  The event which gives rise to this litigation commenced on Friday, May 3, 2013 between 2:15 P.M. and 2:30 P.M. on the southbound number 5 subway train.

30.  On that date and at that time the Plaintiff was on his way to work at the afore-described El Cemi Housing Development on East 117th Street at 2nd Avenue, New York City, New York.

31.  At the time, the Plaintiff was residing with his sister at her Adee Avenue, Bronx, New York residence.

32.  The Plaintiff entered the southbound number 5 subway train at the Gun Hill subway station in the Bronx, New York (in the proximity of Seymour Avenue and Dewitt Place and Sexton Place).

33.  The Plaintiff anticipated riding the subway train to the Lexington Avenue and 116th Street subway station in Manhattan where he would thereat exit the train in order to get to his job at the El Cemi Housing Development on 117th Street and Second Avenue.

34.  The Plaintiff entered the train at about the seventh subway car and immediately walked forward through the doors to what he believes was the sixth car on the train which car, when exited at 116th Street and Lexington Avenue, would position him by the subway stairs to the street at the 116th Street and Lexington Avenue station.

5

35.   The subway was not moving, but was stationary, at the Gun Hill station when the Plaintiff walked through the doors from one car forward to another car (as described above).

36.   Once into what the Plaintiff believes was the sixth car, the Plaintiff walked the length of that car and sat down on the left hand side of the seats at the forward end of that car (as described).

37.   As he was sitting there, the Plaintiff had his bottle of water out when three plain clothes individuals approached his location.

38.   The Plaintiff did not know who the individuals were.

39.   The individuals were all male.

40.   Two of the individuals appeared to the Plaintiff to be white and one individual appeared to be Hispanic.

41.   One of the white males told the Plaintiff to get off the train. The Plaintiff believes that the individual who told him that was Defendant Slockbower.

42.   At or about that time, the individual showed a badge which appeared to identify the individual as a New York City Police Officer.

43.   The individual indicated that they were police officers.

44.   The Plaintiff did not know whether they were police officers or were pretending to be police officers and engaging him for nefarious reasons.

45.   At or about this time, the train was moving (either it had already started to move when the Plaintiff was approached or the train started to move at or about the time the Plaintiff was approached).

46.   In response to the direction that the Plaintiff had to get off the train, the Plaintiff indicated to the three individuals that he was on his way to work.

47.  The white male individual, who was doing the talking, again stated to the Plaintiff that he had to get off the train.

48.  The Plaintiff asked why and received no response.

49.  During the brief exchange of no longer than a few seconds, the Plaintiff was speaking in an ordinary and reasonable voice and was not otherwise making verbal threats of any kind or physical threatening movements of any kind.  He was holding his bottle of water.

50.  The Plaintiff was largely looking downward at the bottle of water which he then possessed.  The Plaintiff also had a bag next to him (in which he had some electronic equipment that he was taking to work with him).

51.  When the Plaintiff received no response to his inquiry about why he was being directed to get off the train, the Plaintiff informed the individual in substance that he was going to work, he was on notice (probation) at his job for attendance, that he was not getting off the train, and that, if they were police officers they would have to arrest him although he had done nothing wrong.

52.  Again, the Plaintiff stated such in a conversational tone and in a reasonable manner and fashion and without any physical actions directed toward anyone or otherwise.

53.  Moreover, the Plaintiff stated such not knowing whether the individuals, who described themselves as police officers and told him to get off the train, were, in fact, police officers because, when they approached the Plaintiff, they did not indicate why they were approaching him and directing him to get off the train and because the Plaintiff, to that point, had done absolutely nothing improper other than to get on the train and, while the train was stationary at least initially, to walk from one car to another car in order to situate himself better to get off the train when the Plaintiff finally arrived at his anticipated destination at 116th Street and Lexington Avenue, New York City, New York.

54.  The foregoing exchanges were brief when, all of sudden and without any fore-warning, the three plain clothes individuals physically assaulted the Plaintiff by

grabbing the Plaintiff from his seat in a forceful manner and fashion and propelling him across the aisle to the seats on the other side of the subway car from where the Plaintiff was sitting when he was approached.

55.  The Plaintiff was propelled in a manner and fashion which caused him to be on his stomach with his back upwards lying on the seat.

56.  The Plaintiff felt the pressure of what appeared to him to be knees on his back pressing forcefully down and someone, as well, grabbing at his ankles.

57.  At the time that such was occurring to the Plaintiff, he was having trouble breathing and he indicated such and, as well, indicated that he was in pain and that he was disabled (the Plaintiff had previously fallen down a stairwell and suffered nerve damage to his left arm which made his left arm partially impaired).

58.  The Plaintiff's arms had been brought to his back and lifted up as if his shoulder was going to be separated and to pop out of place.

59.  The pain that the Plaintiff was suffering in his upper back area was extraordinary.

60.  The pain was severe, excruciating.

61.  The Plaintiff said, in substance, please stop that is really hurting my shoulder and you are going to pop my shoulder.

62. The Plaintiff was rear handcuffed.

63. The Plaintiff was removed from the train at the Pelham Bay Parkway subway station.

64. The Plaintiff was placed on the platform in a sitting position next to a bench.

65. The Plaintiff was directed to get up.

66. Because of the pain and because of his rear handcuffed position and the way his legs were situated, the Plaintiff could not get up on his own accord.

67. The Plaintiff indicated that.

68. One of the individuals indicated that there was nothing wrong with the Plaintiff and, then, the Plaintiff was propelled upwards by the individuals in a forceful manner and fashion and placed on the bench.

69. The Plaintiff was still having trouble breathing and was in severe pain.

70. The Plaintiff made that known to the individuals.

71. The Plaintiff was, then, taken up the stairs, placed on the floor and then placed another bench while the individuals made a call.

72. The Plaintiff was transported to the Transit Division, District # 12 facility –believed to be at 180th Street and East Tremont, in a marked police vehicle.

73. The Plaintiff was brought to a desk location at that facility.

74. The Plaintiff made it known to the personnel at the desk that he was in pain and that he was having trouble breathing.

75. The Plaintiff was placed in a holding cell.

76. Shortly thereafter, medical personnel appeared at the location and the Plaintiff was transported to the Jacobi Medical Center, Emergency Department.

77.  The Plaintiff was x-rayed and received some medication at the afore-described Hospital complex.

78.  After perhaps two hours at the afore-described Hospital complex, the Plaintiff was returned to the District # 12 facility where he remained in a holding cell –still in pain, until he was then transported to the Bronx Central Booking facility.

79.  The Plaintiff remained at the Bronx Central Booking facility until he appeared at his arraignment before a Bronx County Criminal Court Judge on Saturday afternoon, May 4, 2013 (it is believed it was about 3:00 P.M. when the Plaintiff was arraigned).

80.   At that time the Plaintiff pled not guilty to the charges preferred against him and the Plaintiff was released on his own recognizance.

81.   The Plaintiff was charged with disorderly conduct and resisting arrest.

82.   The Plaintiff was not disorderly in any manner or fashion and did not resist arrest in any manner and fashion.

83.   As a matter of fact and as noted previously, the Plaintiff had done absolutely nothing unlawful when he was approached by the three plain clothes mails and directed to get off the train (as described above) and before, without fore-warning, the Plaintiff was assaulted by the three plain clothes officers at or about the time that he asked why he was being directed to get off the train and received no response whatsoever causing him to have a suspicion that, although the individuals had identified themselves as police officers, they may not have been police officers.

84.   The Plaintiff was required to return to the Bronx County Criminal Court on multiple occasions before the charges were adjourned in contemplation of dismissal. On March 18, 2014, the charges were adjourned in contemplation of dismissal.

85.   Moreover, the Plaintiff went to the Montefiore-Albert Einstein Medical Center complex [Weiler Hospital-Emergency Department] subsequent to the May 3, 2013 incident –he believes it to be on two further occasions, in order to address the lingering effects of the injuries which were inflicted upon him by the individuals (as described previously herein).

86.   When the Plaintiff walked through the subway doors separating one car from another car (as described), the subway was in the station and not moving.

87.   Furthermore, the Plaintiff saw no posting respecting prohibiting movement through the doors from one car to another.

88.   Notwithstanding that Defendant Officer Slockbower stated under penalty of law for making a false statement in

the Bronx County Criminal Court Misdemeanor Complaint that
the Plaintiff flailed his arms and twisted his body and
refused to be handcuffed, such is not true because the
Plaintiff never refused to be handcuffed –he had no choice;
and he never flailed his arms and twisted his body because
he was unable to flail his arms or twist his body once,
without fore-warning, he was assaulted by the three plain
clothes individuals (as described previously herein).

    89.  The statements attributed to Defendant Officer
Slockbower (as described), were untrue and were made in
order to interfere with the Plaintiff's Fourteenth
Amendment guaranteed due process right to a fair trial.

    90.  It is believed that the Plaintiff's stop and
detention and arrest was part of a New York City Police
Department quality of life/"broken windows" field operation
law enforcement initiatives and policies and practices
which were undertaken by the police and which caused the
Plaintiff to be stopped and detained and arrested and to be
subjected to force although the Plaintiff had not done
anything which any reasonable person, including law
enforcement agents, could have reasonably and objectively
suspected or believed to have been criminal in nature or
otherwise unlawful and did not, as it is asserted he did,
resist arrest and be disorderly.

    91.  There was no specific or particular information
available to the Defendant Police Officers that the
Plaintiff was engaged in any unlawful activity; and he was
stopped, detained and arrested without any objectively
reasonable suspicion or belief for such as is required
under the law for a proper stop and detention.

    92.  The Plaintiff committed no criminal offense or
other offense whatsoever and no reasonable police officer
could have believed that the Plaintiff committed any
criminal offense or any other offense under the law to
justify his stop and detention and arrest or to justify the
utilization of the unreasonable, unnecessary and excessive
force applied to the Plaintiff associated with his stop and
detention.

    93.  There was no basis for the stop and detention of
the Plaintiff by the afore-mentioned New York City Police
Officers.

94.   There was no basis for the utilization of the force applied to the Plaintiff by the afore-mentioned New York City Police Officers.

95.   While the actions and conduct of the New York City Police Officers were unlawful they were taken in the course of their duties and functions and incidental to the otherwise lawful performance of those duties and functions as New York City Police Officers and as an agents and employees of the City of New York.

96.   It is believed that the New York City Police Officers who engaged in the afore-described conduct were, among others, "John Does", Matthew Rodriguez, Shield # 25611, Robert Riccardi (now retired), and  Thomas Slockbower, Shield # 14493, the latter of whom it is believed was the Plaintiff's arresting Officer and the Officer who, upon personal knowledge, executed the Bronx County Criminal Court Misdemeanor Complaint and knowingly made false statements therein, this notwithstanding the warning, of which he was aware that the making false statements in said Complaint was done under the threat of the penalty of law for making false statements.

97.   There was no objectively reasonable suspicion or belief for the Plaintiff's stop and detention and arrest by the afore-described Police Officers.

98.   There was no objectively reasonable basis for the utilization of the force applied by the afore-described Officers to the Plaintiff when he was stopped and detained.

99.   The Plaintiff was unreasonably stopped and detained and arrested and was subjected to excessive and unreasonable and unnecessary force associated with the stop and detention and arrest and was, otherwise, subjected to the interference of the Plaintiff's right to a fair trial because of the assertion of false statements in the Bronx County Criminal Court Misdemeanor Complaint (as described previously).

100.   It is believed that the actions and conduct herein described were propelled by the "broken widows"/quality of life crime offense enforcement initiatives of the City of New York which is grounded in the philosophy of the "ends justifies the means".

101. Such crime offense enforcement initiative propels officers to stop and detain and arrest individuals when there is no objectively reasonable basis for the stop and detention and arrest of individuals and, by such, to generate arrest statistics and to otherwise make examples of individuals in the hope that such would depress actual crime or other unlawful conduct by individuals who might be inclined to engage in such criminal or otherwise unlawful conduct.

102. In that regard and as reported in a February 28, 2014 New York Daily News article, the New York City Police Commissioner William Bratton, in defending the targeting of $2.50 fare cheats as part of a crime fighting strategy dating to his 1990's New York tour of duty", stated: "Some people might say, 'Why are you worried about that?" "the 'New York miracle,', if you will, began with fare evasion. Twenty-five years later, 'we're still at it."

103. The New York Times reported in a March 5, 2014 article that Police Commissioner Bratton, "speaking at a breakfast meeting of business leaders at the Waldorf Astoria" on March 4, 2014, "signaled that he intended to model his patrol strategy on the 'broken windows' theory, much as he had at the beginning of his previous tenure as the city's police commissioner in the mid-1990…" Speaking to the "broken windows" policy, Bratton is quoted as saying: "If you take care of the little things, then you can prevent a lot of the big things".

104. Continuing in this regard he is reported to have stated: "That has been the foundation of my policing strategy", which, as summarized in the Times article "holds that maintaining order and curbing low level violations help reduce more serious crime".

105. The Times reported that Police Commissioner Bratton said that the "broken-windows policing theory", "works and it will remain a cornerstone of the policy" of the New York City Police Department.

106. Finally and according to the New York Times which summarized the Commissioner's position, "he [the Police Commissioner] intended for his officers to aggressively enforce the law against low-level offenders to ensure that public places feel safe."

107.   As a consequence of the foregoing quality of life/"broken-windows" policing policy and strategy and practice, it is believed that New York City Police Officers are propelled to achieve certain "goals" relative to arrests for minor quality of life/"broken-windows" type offenses including fare evasion offenses and other subway related minor offenses; and therefore police officers are propelled to make low level, quality of life/"broken-windows" offense arrests; and therefore, in order to achieve those arrest goals, New York City Police Officers are driven to make objectively unreasonable stops and detentions and/or to make objectively unreasonable probable cause lacking arrests for those minor quality of life/"broken-windows" crime offenses including objectively unreasonable stops and detentions and/or objectively unreasonable probable cause lacking arrests for alleged fare evasion offenses or other minor subway related offenses; and, associated with such objectively unreasonable stops and detentions and/or objectively unreasonable probable cause lacking arrests, cause New York City Police Officers to be over-zealous and rude and to utilize unnecessary and unreasonable and excessive force (including, as a consequence of the objectively unreasonable stop and detention of the Plaintiff and including the objectively unreasonable and unnecessary and excessive utilization of force against the Plaintiff associated therewith—as described previously herein); and, as well, to make false statements in order to justify the stops, detentions, arrests, and the use of force, this notwithstanding that making such false statements interferes with an individual's right to a fair trial arising out of any arrest and notwithstanding that making the false statements is done under the threat of penalty of law.

108.   The Plaintiff was unlawfully stopped and detained and arrested and subjected to excessive and unreasonable and unnecessary force and subjected to interference with his right to a fair trial.

109.   The actions, conduct, policies and practices and customs herein described violated the Plaintiff's rights as guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

110.   The Plaintiff suffered injuries and damages including loss of liberty, fear, anxiety, mental distress, emotional anguish, embarrassment, humiliation, and psychological trauma and physical pain and suffering.

111.   The Plaintiff has not yet placed a monetary value on the damages which he incurred although he believes them to be substantial and to include compensatory and punitive damages.

112.   The Plaintiff has no other adequate remedy at law but for the institution of this litigation.

V.   CAUSES OF ACTION

A.   FIRST CAUSE OF ACTION

113.   The Plaintiff reiterates Paragraph #'s 1 through 112 and incorporates such by reference herein.

114.   The Plaintiff was unlawfully stopped and detained and arrested in violation of his rights as guaranteed under the Fourth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

115.   The Plaintiff suffered injuries and damages.

B.   SECOND CAUSE OF ACTION

116.   The Plaintiff reiterates Paragraph #'s 1 through 115 and incorporates such by reference herein.

117.   The Plaintiff was subjected to the interference of his right to a fair trial when Defendant Slockbower made false statements in the Bronx County Criminal Court Misdemeanor Complaint (under penalty of law) in violation of the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

118.   The Plaintiff suffered injuries and damages.

C.   THIRD CAUSE OF ACTION

119.   The Plaintiff reiterates Paragraph #'s 1 through 118 and incorporates such by reference herein.

120.   The Plaintiff was  subjected to unnecessary, unreasonable and excessive force in violation of his rights as guaranteed under the Fourth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

121.   The Plaintiff suffered injuries and damages.

### D.   FOURTH CAUSE OF ACTION

122.   The Plaintiff reiterates Paragraph #'s 1 through 121 and incorporates such by reference herein.

123.   The policies, practices and customs herein described propelled the actions and conduct herein. Those policies and practices related to the broken-windows/quality of life initiatives and the training and other matters associated therewith and include the training policy and practice associated with the use of force by New York City Police Officers in the performance of their duties and functions. Those policies, practices, and customs violated the Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

124.   The Plaintiff suffered injuries and damages.

### E.   FIFTH CAUSE OF ACTION

125.   The Plaintiff reiterates Paragraph #'s 1 through 124 and incorporates such by reference herein.

126.   It is believed that the policies and practices as applied have a disproportionate impact on members of New York City's minority communities, especially and particularly black and brown peoples including Latino community members and African American community members.

127.   The policies and practices as applied are racially discriminatory and violate the Plaintiff's rights under the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

128.   The Plaintiff suffered injuries and damages.

F. SIXTH CAUSE OF ACTION

129.  The Plaintiff reiterates Paragraph #'s 1 through 128 and incorporates such by reference herein.

130.  When the City of New York represents its Officers in federal civil rights litigations alleging unconstitutional actions by its officers (which is almost always the case in 99.99 percent if not more of the situations where an Officer seeks representation), it is believed that it ordinarily and uniformly and as a matter of policy and practice indemnifies its Officers for any award of both punitive damages and compensatory damages.

131.  It is believed that the Officer-employee executes a retainer indemnification and representation letter which requires the Officer-employee, in return for indemnification, to subordinate his or her interests to the interest of his/her employer and indemnifier –the Defendant City of New York.

132.  It is believed, moreover, that, when a judgment is obtained against a New York City Police Officers for an Officer's violation of an individual's federally guaranteed Constitutional and civil rights and where the Officer has been represented by the New York City Attorney's Office and where the City of New York has paid the judgment of damages (compensatory and/or punitive damages), the Officer almost never has been subjected to a New York City Police Department disciplinary hearing and/or the imposition of discipline; and it is believed that, when a settlement has been made in such a litigation, the Officer ordinarily is never even informed of such.

133.  It is believed, moreover, that when a judgment is obtained against a New York City Police Officer being represented by the New York City's attorney office for the violation of an individual's constitutional and civil rights, the City of New York takes no action whatsoever to address such and discipline and/or train-retrain the Officer in any form or fashion for his or her unlawful and unconstitutional conduct and/or that the City does not change those policies and practices that propelled said conduct.

134.  The City of New York is, under the circumstances, the real party in interest.

135.   The named and unnamed individual Defendants are employees and agents of the City of New York and their conduct, as described, was taken in the course of their duties and functions as New York City Police Officers and, in their capacities as such, as agents and employees of the City of New York.

136.   Their actions and conduct, while unlawful and unconstitutional, nonetheless were actions and conduct taken to the otherwise lawful performance of their duties and functions as agents and employees of the City of New York.

137.   The Plaintiff is entitled to recover against the City of New York for the conduct of its named and unnamed Officers under the federal claim jurisdiction pursuant to the doctrine of respondeat superior.

138.   The Plaintiff suffered injuries and damages.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke the jurisdiction of this Court.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the interest of justice.

DATED: New York, New York
       October 24, 2014

                    Respectfully submitted,

                    /s/James I. Meyerson____
                    JAMES I. MEYERSON
                    1065 Avenue of the Americas
                    Suite # 300 (c/o NAACP)
                    New York, New York 10018
                    [212] 344-7474/Extension 129
                    [212] 409-8890 (E-FAX)

                    ATTORNEY FOR PLAINTIFF
                    BY:_____